

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**JOHN KEITH DAILY, on behalf of**   )
**the class of persons described herein,**  )
   )
   )
    **Plaintiffs,**   )
   )
**v.**   )    **Case No.: 2:15-CV-1138-VEH**
   )
**THE RAWLINGS COMPANY,**   )
**LLC, et al.,**   )
   )
    **Defendants.**   )

---

## <u>MEMORANDUM OPINION</u>

This civil action was commenced on July 7, 2015, by the filing of a "Class Action Complaint," by the named plaintiff, John Keith Daily, against "The Rawlings Company, LLC" ("Rawlings") and "Aetna Life Insurance Company" ("Aetna").[1] Against both Rawlings and Aetna, the complaint alleges the Alabama state law claim for "Interference with Business/Contractual Relations" (Count One). Against Rawlings alone, the complaint alleges a violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1601, *et seq.* (Count Two), and an Alabama

---

[1] To date, no motion to certify a class has been filed.

state law claim for the "Unauthorized Practice of Law" (Count Three).[2] All counts

arise out of the settlement of Daily's personal injury claim against a third party, and

the attempts by Rawlings and Aetna to enforce Aetna's subrogation interest.

The case comes before the court on Rawlings and Aetna's Motion to Dismiss

(doc. 24), Rawlings and Aetna's "Motion for a Discovery Stay Pending Their Motion

to Dismiss" (doc. 43), and Daily's "Corrected Motion to Amend Complaint" (doc.

45). For the reasons stated herein, the motion to dismiss will be **GRANTED** and this

case will be **DISMISSED**. The motion to amend will be **DENIED** as futile, and the

motion to stay will be **DENIED** as moot.

## I.   THE MOTION TO AMEND (DOC. 45)

The Eleventh Circuit Court of Appeals has noted:

> "Although '[l]eave to amend shall be freely given when justice so
> requires,' a motion to amend may be denied on 'numerous grounds' such
> as 'undue delay, undue prejudice to the defendants, and futility of the
> amendment.' " *Brewer–Giorgio v. Producers Video, Inc.*, 216 F.3d
> 1281, 1284 (11th Cir.2000) (*quoting Abramson v. Gonzalez*, 949 F.2d
> 1567, 1581 (11th Cir.1992)).

*Maynard v. Bd. of Regents of Div. of Universities of Florida Dep't of Educ. ex rel.*

*Univ. of S. Florida*, 342 F.3d 1281, 1287 (11th Cir. 2003). The <u>only</u> argument made

by the defendants in opposition to the motion to amend is that, because none of the

---

[2]  Count Four of the complaint alleges no cause of action.  Instead, Count Four is a
"Claim for Injunctive and Declaratory Relief."

factual allegations will change with the amendment,[3] the amendment would be futile, as the complaint will be still be dismissed for failure to state a claim upon which relief may be granted. In support of that argument, the defendants incorporate their briefs in support of their motions to dismiss. (Docs. 24, 37).

The court has examined the proposed "First Amended Class Action Complaint" (hereinafter the "amended complaint"). Indeed, except for a few word changes which are not relevant to this motion, the "facts" pled in the amended complaint are identical to those pled in the original complaint. Accordingly, the court will defer ruling on the motion to amend until after it examines the arguments in support of the motion to dismiss.

## II.     THE MOTION TO DISMISS (DOC. 24)

### A.     <u>Standard of Review</u>

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* Fed.

---

[3] The plaintiff agrees with this contention.  As noted by the plaintiff:

The only change in the First Amended Class Action Complaint is that the class definition has been changed to include separate classes against [d]efendants Rawlings Company, LLC, ("Rawlings") and Aetna Life Insurance Company, ("Aetna"), reflecting that the causes of action asserted against Rawlings affect a class broader than only those who are covered by Aetna, or are participants in a health benefit plan administered by Aetna.

(Doc. 45 at 2; *see also*, doc. 49 at 2 (Plaintiff's Reply to Opposition to Motion to Amend Complaint) ("The only change is the breadth of the class definition.")).

R. Civ. P. 12(b)(6) ("[A] party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting Fed. R. Civ. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* Fed. R. Civ. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying

4

pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine <u>whether they plausibly give rise to an entitlement to relief</u>." *Id.* (emphasis added). "Under *Twombly*'s construction of Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line from conceivable to plausible.' *Ibid*." *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

**B.**   <u>**Facts**</u>

The factual allegations in the proposed amended complaint read:

6.     On the evening of September 16, 2014, Daily was traveling on Greensport Road at the intersection of Peaceful Valley Road in St. Clair County, Alabama, when Samantha Kelley pulled out in front of him, causing a collision in which the [p]laintiff was injured and incurred medical expenses.

7.     At the time, plaintiff Daily had a health insurance policy through his employer, Total Safety U.S., Inc's, benefits plan [("the Plan")]. Aetna administered those health benefits, and paid Mr. Daily's medical bills.

8.     Samantha Kelley, at the time of the accident, was insured by Nationwide Insurance Company.

9.     Shortly after the date of the collision, Counsel for Mr. Daily made a demand on Nationwide for its $100,000.00 policy limits on the automobile policy covering Ms. Kelley. In addition, counsel for Mr. Daily made demands on behalf of his client pursuant to the uninsured/underinsured coverage Daily had with State Farm Mutual Automobile Insurance Company ("State Farm"), and Allstate Property and Casualty Company ("Allstate").

10.     Beginning in October, counsel for Mr. Daily attempted to negotiate settlements with Nationwide, State Farm, and Allstate. All applicable medical records and expenses were sent to the three insurers, and Mr. Daily's counsel received copies of the applicable policies so that he could verify coverages and policy limits.

11.     On October 14, 2014, counsel for Mr. Daily received notice from Aetna of [the Plan's] subrogation claim on Mr. Daily's tort recovery in the amount of $3,445.87.

12.     On or about November 21, 2014, counsel for Mr. Daily received an updated lien from Rawlings, stating a subrogation demand on behalf of Aetna for $25,382.36.

13.     Rawlings was acting on behalf of Aetna, [the Plan's] administrator, and Aetna and Rawlings will be referred to collectively sometimes herein as Aetna/Rawlings.

14.     The subrogation claims that Aetna hired Rawlings to collect are those of [the Plan]. There is no question that those claims, or debts, do not belong to Rawlings.

15.    The Rawlings Company, LLC, is not a law firm, and is not authorized to practice law in Alabama. Despite this fact, Rawlings, through non-lawyers holding the title "Recovery Analyst" sends correspondence to . . . beneficiaries with tort claims like Mr. Daily including legal arguments that Aetna is entitled to assert its subrogation claims directly, and that Aetna/Rawlings does not have to pay any of the costs of collection. . . .

16.    In addition to sending the above-referenced correspondence, those "Recovery Analysts" assert legal claims on behalf of Rawlings' clients, and negotiate the settlement of subrogation claims. Neither Rawlings or its employees performing these functions are licensed to practice law in Alabama.

17.    On November 24, 2014, counsel for Mr. Daily sent Aetna/Rawlings's notice of its $25,382.36 subrogation interest to Nationwide, and accepted Nationwide's offer to settle the case against its insured Kelley for the $100,000.00 Nationwide policy limits.

18.    In a letter dated November 24, 2014, but not received until at least the next day, counsel for Mr. Daily received another updated lien amount. Aetna/Rawlings now stated its subrogation interest as $86,510.74.

19.    At the same time, counsel for Mr. Daily continued to provide all information requested by Allstate and State Farm in an attempt to resolve the matter with those carriers.

20.    On December 1, 2014, counsel for Mr. Daily received a letter from Allstate agreeing to waive its subrogation interest, and advising him to accept the Nationwide offer.

21.    On December 15, 2014, counsel for Mr. Daily received an offer from State Farm of its $25,000.00 policy limits, contingent upon being provided a copy of the written Nationwide offer to settle for its $100,000.00 policy limits, and the Nationwide declarations page from its policy with Ms. Kelley. Those documents were provided to State Farm the next day, and the agreement was formalized in a writing.

22.    Unbeknownst to counsel for Mr. Daily at the time, Rawlings, per its custom and practice, had been in communication with Nationwide, Allstate, and State Farm, demanding that Aetna's lien amount be paid directly to it before the insurers completed their settlements with Mr. Daily.

23.    None of these payments have been made, and the settlements have not been completed.

24.    The monies have not been sent to counsel for Daily because Aetna/Rawlings has interfered with the contracts to settle the case between Mr. Daily, through counsel, and Ms. Kelley/Nationwide/ State Farm.

25.    In fact, Nationwide, through counsel, has advised counsel for Daily that it cannot send the funds pursuant to the agreement to settle the case because Rawlings has told counsel for Nationwide that it will sue Nationwide if it does so.

26.    State Farm has not paid its monies pursuant to its agreement. Allstate has dragged its feet, asking for superfluous information, and providing other excuses to delay. The truth of the matter is that it too, has been advised by Rawlings that suit will be instituted for the Aetna subrogation amount if the funds are not paid directly to Rawlings.

27.    Rawlings has made its demands directly upon the insurers despite the fact that it has no contractual or other relationship with either tortfeasor Kelley, her insurer Nationwide, or Mr. Daily's uninsured/underinsured carriers Allstate and State Farm.

28.    What Aetna has is an equitable lien known as a subrogation claim to Daily's tort recovery. That claim is founded on the contract between Aetna and Daily. Aetna/Rawlings has no right or privilege to interfere with the legal contract between Daily and tortfeasor Kelley and her insurers, or Mr. Daily and his uninsured/underinsured carriers Allstate and State Farm. Without a tort action and recovery by Daily, Aetna has nothing to subrogate to.

29.     [The Plan has] the right to subrogate to any tort recovery [Daily] obtains. However, the Plan language states only [that] it may make a claim and take appropriate action to assert its subrogation claim. What Aetna/Rawlings' actions fail to recognize [sic] is that they have no subrogation claim until such time Mr. Daily makes a recovery.

30.     Not only has Rawlings/Aetna interfered with Daily's contractual relationships with Nationwide, Allstate, and State Farm, but they want Daily to collect its subrogation interest for it without paying for the attorney Daily must hire to collect for his tort claim that creates the fund from which Rawlings/Aetna can collect its subrogation interest in the first place. Rawlings essentially asserts that it is entitled to free collection services.

31.     Rawlings is not entitled to free collection services for its subrogation claim through the use of Daily's attorney. First, without Daily's efforts to collect on his tort claim, Aetna's subrogation claim does not exist. Second, under Alabama law, if Rawlings wants to participate in the funds created by Daily through his tort claim by subrogating to that fund, it must pay its share of the expenses, including attorneys' fees, in creating that fund.

32.     As a result of Rawlings/Aetna's interference, Daily does not have the $125,000.00 in settlement funds that he has contracted for, or what funds he would have had as the result of his insurance policy with Allstate.

(Doc. 45-1 at 2-8) (footnotes omitted).

As noted by the defendants in their initial brief, the Plan at issue in this case

provides that:

– The Plan holds a right of subrogation or reimbursement which extends to any insurance recovery from tortfeasors who may cause Daily injury.

– Immediately upon paying or providing any benefit under the Plan, the

Plan shall be subrogated to (stand in the place of) all rights of recovery.

– The Plan may assert a claim or sue in Daily's name and take appropriate action to assert subrogation, with or without his consent.

– If Daily receives any payment as a result of an injury for which the Plan has paid benefits, he must reimburse the Plan for all amounts paid.

– The Plan[']s[] Claims Administrator has sole authority and discretion to resolve all disputes regarding subrogation and reimbursement under the Plan[.]

– The Plan recovery rights are a first priority claim to be repaid before Daily receives any recovery for damages. The Plan is not required to pay any court costs or attorney fees to any attorney Daily hires.

– Finally, by accepting benefits under the Plan, Daily agreed to cooperate fully with the Plan's efforts to recover benefits paid.

(Doc. 24 at 7) (citing doc. 24-2 at 66-67).[4] The Plan also provides that the beneficiary

---

[4]  The Eleventh Circuit has noted:

"[A] document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed. *See Harris v. Ivax Corp.,* 182 F.3d 799, 802 n. 2 (11th Cir.1999). "Undisputed" in this context means that the authenticity of the document is not challenged. *See, e.g., Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 16–17 (1st Cir.1998); *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir.1997); *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994).

*Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).  The Plan documents are certainly central to the plaintiff's claims in this case, and the authenticity of said documents, which are attached to the motion to dismiss, has not been disputed by the plaintiff.  Accordingly the Plan documents will be considered by the court without converting the motion to a motion for summary judgment.

of the Plan "[g]enerally [is] required to complete all appeal processes of the Plan before being able to obtain External Review or bring an action in litigation." (Doc. 24-2 at 72).

## III.  ANALYSIS

### A.  <u>ERISA Exhaustion</u>

"The law is clear in this circuit that plaintiffs in ERISA actions must exhaust available administrative remedies before suing in federal court." *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir.2006) (*quoting Counts v. Am. Gen. Life & Accident Ins. Co.*, 111 F.3d 105, 108 (11th Cir.1997)) (internal quotation marks omitted).

*Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223-24 (11th Cir. 2008).  "Th[e] exhaustion requirement applies equally to claims for benefits and claims for violations of ERISA itself." *Lanfear*, 536 F.3d at 1224. Although the instant action is not a claim for benefits under the Plan, and alleges no statutory violation of ERISA, the motion, nonetheless, argues that all of the plaintiff's claims, against both defendants, fail because he should have, and did not, exhaust his administrative remedies under the Plan prior to bringing this action. (Doc. 24 at 11-14; doc. 37 at 5-6). There is unpublished authority in the Eleventh Circuit which holds that this is a "jurisdictional defense." *Herman v. Hartford Life & Acc. Ins. Co.*, 508 F. App'x 923, 926 (11th Cir. 2013); *contra Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006) (a failure to exhaust ERISA administrative remedies is not

jurisdictional, but is an affirmative defense); *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 280 (3d Cir. 2007) (exhaustion requirement is a nonjurisdictional affirmative defense); *Crowell v. Shell Oil Co.*, 541 F.3d 295, 309 (5th Cir. 2008) ("Other circuits have expressly held that ERISA exhaustion is not jurisdictional, and we agree."). Accordingly, despite this court's holdings in the remainder of this opinion, this issue must be addressed.

The defendants' argument is based on the following language in the plan: "Generally, you are required to complete all appeal processes of the Plan before being able to obtain External Review or bring an action in litigation." (Doc. 24-2 at 72). They also note that, as to the portion of the plan concerning "Subrogation and Right of Recovery," the plan provides that

> [i]n the event that any claim is made that any part of this subrogation and right of recovery provision is ambiguous or questions arise concerning the meaning or intent of any of its terms, the Claims Administrator for the plan shall have the sole authority and discretion to resolve all disputes regarding the interpretation of this provision.

(Doc. 24-2 at 67). The defendants argue that, to the extent that Daily is arguing that the plan does not authorize their conduct, that is "[a] dispute[] regarding the interpretation" of the subrogation and right of recovery provisions in the plan. (Doc. 24 at 12). In response, the plaintiff argues that the exhaustion requirement does not apply because the plaintiff "does not assert an ERISA claim for benefits, nor are the

claims premised on an ERISA statutory violation." (Doc. 36 at 10).

In their initial brief, the defendants cite two cases in support of their argument: *Springer v. Wal-Mart Associates' Grp. Health Plan*, 908 F.2d 897, 898 (11th Cir. 1990), and *Bickley v. Caremark Rx, Inc.*, 461 F.3d 1325 (11th Cir. 2006). Both are distinguishable on their facts.[5]

In *Springer*,

Defendant Wal–Mart Associates' Group Health Plan ("Wal–Mart") appeal[ed] from the district court's judgment awarding $20,181.79 in medical benefits to plaintiff Ethelene Springer under Wal–Mart's ERISA-governed employee health benefit plan ("the Plan").

. . .

Springer ha[d] been an employee of Wal–Mart Stores since April 20, 1987. Springer, her husband Larry, and her young daughter Shalana [were] "participants" in the Plan, Springer as an "eligible associate," and

---

[5] In *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985), the Eleventh Circuit wrote:

Compelling considerations exist for plaintiffs to exhaust administrative remedies prior to instituting a lawsuit. Administrative claim-resolution procedures reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan's trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decisionmaking process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated. . . . In addition, imposing an exhaustion requirement in the ERISA context appears to be consistent with the intent of Congress that pension plans provide intrafund review procedures.

*Mason*, 763 F.2d at 1227 (citations omitted).  The defendants make no argument that imposing the requirement under the circumstances of this case would further any of these "compelling considerations."  Accordingly, the court will examine only the applicability of the cases cited.

Larry and Shalana as "eligible dependents." The Plan is self-insured and is funded by premiums from Wal–Mart Stores employees and matching contributions from Wal–Mart Stores. On November 7, 1987, the Springers were injured in an automobile accident caused by the drunk driver of the other car, Jerry Thigpen, who was uninsured. Springer's car was insured by State Farm Insurance Company ("State Farm"), under a policy which included uninsured motorist and medical payments coverage. Following the accident, Springer sued Thigpen for damages, sued State Farm for refusal to pay under its policy, and filed claims for medical expenses under the Plan on behalf of herself, Larry, and Shalana. The Springers' medical expenses totalled $35,181.79.

In response to Springer's claims, Wal–Mart, on December 28, 1987 (as to Larry's expenses), January 14, 1988 (as to Springer's expenses), and February 4, 1988 (as to Shalana's expenses), sent Springer explanatory letters with accompanying "reimbursement agreements" stating that, in accordance with the Plan, Springer's claims could not be processed, nor any benefits awarded, until and unless Springer completed, signed, and returned the enclosed agreements. The reimbursement agreements essentially would have given Wal–Mart the right to seek reimbursement for benefits paid by suing in Springer's name, joining in any lawsuit of Springer's against any third party regarding the accident, or sharing in any settlement agreement received by Springer. Springer refused to sign or return the agreements. Although the Plan, to which Springer had access, provides for a mandatory internal appeals process prior to bringing any lawsuit, Springer did not seek internal administrative review of Wal–Mart's refusal to proceed further with her claims. On April 7, 1988, she brought the present lawsuit against Wal–Mart, seeking payment for the medical expenses. Following an advisory jury trial, the district court entered judgment for Springer on June 6, 1989.

*Springer*, 908 F.2d at 898-99. The Eleventh Circuit held that the exhaustion requirement applied to the claims against Wal-Mart, writing "it is no longer open to serious dispute that plaintiffs in ordinary breach-of-contract ERISA actions must

normally exhaust available administrative remedies." *Id.* at 900.

The defendants contend that *Springer* stands for the proposition that "[t]he exhaustion requirement applies to cases alleging statutory violation of ERISA and cases asserting common law claims based upon the employee benefit plan." (Doc. 24 at 12). However, in *Springer*, the common law claim was for breach of contract for denial of benefits under the plan. In the instant case there is no such claim. The plaintiffs' health benefits have already been paid.

In *Bickley*, the plaintiff alleged that prescription drug benefits under his employer's plan were administered by Caremark, which "buys drugs from manufacturers, sells drugs to retail pharmacies, operates a service where Plan members can fill their prescriptions by mail, and negotiates prescription drug prices with manufacturers and retail pharmacies." *Bickley*, 461 F.3d at 1327. The court explained:

> Bickley filed this class action suit against Caremark on behalf of the Plan pursuant to section 502(a)(2) and (a)(3) of ERISA. Because of its management of the prescription drug benefits, Bickley alleges that Caremark is a fiduciary to the Plan. Bickley also alleges that Caremark breached its fiduciary duties, in violation of ERISA section 409, by enriching itself "through undisclosed discounts, rebates, coupons and other forms of compensation from drug companies and pharmacies." Bickley further alleges that Caremark creates undisclosed pricing "spreads" between the discounted price it pays to retail pharmacies and drug manufacturers and the discounted price it contracts to be reimbursed by the Plan. Bickley alleges that Caremark receives undisclosed discounts, rebates, and soft dollars from drug manufacturers

15

> in exchange for favoring that drug manufacturer's drug over another in
> its standardized formulary and drug switching programs. Bickley asserts
> that Caremark failed to disclose these practices and retention of these
> profits, and that Caremark evades the government's best pricing statute,
> the Omnibus Budget and Reconciliation Act, by conspiring with drug
> manufacturers. Bickley sought declaratory and injunctive relief,
> attorneys' fees and costs, and an accounting for all Plan assets and
> profits Caremark retained for its own benefits.

*Bickley*, 461 F.3d at 1327-28. On appeal, the plaintiff argued "that the district court

should have excused his failure to exhaust the administrative remedies because . . .

the administrative scheme set out in the Plan was limited solely to a claim for

benefits." *Id.* at 1329. The Eleventh Circuit disagreed, writing:

> Although the Plan's administrative scheme related to "claims," the Plan
> also provided that "[i]f you have questions about your plan, you should
> contact the Plan Administrator [which] has the exclusive responsibility
> and complete discretionary authority to control the operation and
> administration of the Plan, with all power necessary to ... resolve all
> interpretive, equitable and other questions that shall arise in the
> operation and administration of this Plan." . . . Thus, as the district court
> properly held, "[t]aking all the provisions as a part of an integrated
> Agreement and viewing the same provisions in the light of ERISA's
> integrated statutory scheme, ... Bickley and other Plan members do have
> an administrative remedy." . . . According to the Plan, the Plan
> Administrator . . . or the Plan Benefits Claim Processor, can receive and
> review claims such as Bickley's and respond. In fact, not only can [the
> Administrator] respond to such claims, it has the duty to consider the
> pursuit of breach of fiduciary duty claims on behalf of the Plan.

*Id.* at 1329-30 (internal citations omitted).

The defendants insist that "at the core" the plaintiff's claims in the instant case

are "about what [d]efendants are or are not allowed to do under the Plan." (Doc. 37

16

at 5). It appears that the defendants are arguing that *Bickley* stands for the proposition that every time an ERISA administrator is sued <u>for anything</u>, as long as their defense is based on some right provided to them by the Plan, the action is automatically converted to an ERISA claim, and the plaintiff must have exhausted administrative remedies before filing suit. This court does not read that case so broadly. "Th[e] exhaustion requirement applies equally to claims for benefits and claims for violations of ERISA itself." *Lanfear*, 536 F.3d at 1224. The instant case presents neither scenario.

Also, in *Bickley*, the suit was for a statutory violation of ERISA, brought against the plan administrator, for enriching itself through the way it operated the plan, at the expense of benefits to the plan's participants. The plan in that case provided for a method to resolve the very issue (breach of fiduciary duty) which related to the statutory ERISA claim. Certainly, in this case, whether the plan allows the defendants to engage in the conduct alleged is an issue. However, it does not arise in the context of a claim for benefits or a claim of a statutory violation causing injury to the plan as a whole. For that reason, *Bickley* is distinguishable.

In their reply brief, the defendants cite to several of the cases first cited by the plaintiff on this issue, and argue that those cases actually support <u>their</u> position. As shown below, they do not.

*In La Ley Recovery Sys.-OB, Inc. v. United Healthcare Ins. Co.*, No. 14-CV-23802-UU, 2014 WL 7525703 (S.D. Fla. Dec. 12, 2014) the plaintiff asserted that the health insurer had "failed to make payment for the services provided by [his doctor] in the amount that was billed." *La Ley*, 2014 WL 7525703, at *1. The issue in *La Ley* was whether the plaintiff's state law claims were completely preempted by ERISA. The court noted that, in order to answer this question, it would have to determine: (1) whether the plaintiff could have brought its claim under ERISA's civil enforcement provision, § 502(a); and (2) whether no other legal duty supports the plaintiff's claim. *La Ley*, 2014 WL 7525703, at *2. As to the second prong, the court wrote:

> "If a party is suing under obligations created by the plan itself, instead of under obligations independent of the plan and the plan member, the alleged obligations implicate legal duties which are not entirely independent of ERISA, and thus are subject to complete preemption." [*Gables Ins. Recovery v. United Healthcare Ins. Co.,* 39 F. Supp. 3d 1377, *7 (S.D. Fla. 2013)] (internal quotations and citations omitted)."[A]ny determination of benefits under the terms of a plan—i.e., what is 'medically necessary' or a 'Covered Service'—does fall within ERISA ." *Lone Star OB/GYN Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 531 (5th Cir.2009)."If the right to payment derives from the ERISA benefit plan as opposed to another independent obligation, the resolution of a right to payment dispute requires an interpretation of the plan.... Thus, any determination of benefits under the terms of an ERISA plan, even regarding a seeming independent breach of oral or implied contract based on verification of those benefits, falls under ERISA and is a legal duty dependent on, not independent of, the ERISA plan."*Gables Ins. Recovery*, 2013 WL 9576688, at *7 (internal citations omitted).

18

Despite Plaintiff's allegations, its claims are based on interpreting the ERISA plan and determining whether Dr. Blanco's services fall within the plan's coverage. See D.E. 1–2 ¶¶ 7, 25 ("This action arises out of Defendant's breach of its common law duties under the applicable health insurance contract ... Dr. Olivio Blanco, Jr., rendered health care services that were reasonable and medically necessary and otherwise in furtherance and for the benefit of the patient/insured."). As such, both prongs of [the test] are met, and Plaintiff's Complaint is subject to complete preemption by ERISA. Plaintiff's Motion to Remand must therefore be denied because federal jurisdiction exists.

*Id.* at *4.

First, unlike *La Ley*, the issue in the instant case is not preemption. Further, the plaintiff in the instant case is not a party "suing under obligations created by the plan itself, instead of under obligations independent of the plan and the plan member." The instant case is not about the "right to payment," or the "determination of benefits under the terms of an ERISA plan." It is only whether the Plan provides a <u>defense</u>[6] to the alleged breach of obligations imposed by Alabama common law.

The defendants also cite *In re Managed Care Litig.*, 595 F. Supp. 2d 1349, 1356 (S.D. Fla. 2009), which, like *La Ley*, deals with issues relating to <u>benefits</u>. As noted by the court:

---

[6] Specifically, as noted below, the issue involves determining whether the defendants' alleged interference was "justified"–"an affirmative defense to be pleaded and proved by the defendant." *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 600 (Ala. 1986) *overruled on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009).

Plaintiffs allege to have provided dental services as "out of network" providers to members of health plans administered by WellPoint and governed by ERISA. These services were performed pursuant to the terms and conditions of the subscriber agreements. Under these agreements, WellPoint was obligated to pay its subscribers or their "out of network" providers the actual amount these providers charged for their services, assuming the annual deductible was met, minus any applicable co-payment amount paid by the subscriber. According to Plaintiffs, the only instance in which WellPoint was excused from paying the actual amount charged by the "out of network" provider was where it demonstrated, using a valid data, that the treating dentist's actual charges "exceed[ed] the customary and reasonable allowance" for the particular procedure in question. Plaintiffs further allege that WellPoint used and continues to use a flawed and inadequate database developed by Health Insurance Association of America ("HIAA" or "Ingenix") in making its benefits calculation for "out of network" providers under all of its administered plans.

In their three-count Class Action Complaint, Plaintiffs allege that (1) WellPoint violated ERISA by underpaying its subscriber-patients for the services rendered by the "out of network" dentists, and (2) WellPoint's statements to its subscribers regarding the excessive costs of "out of network" services constituted trade libel and tortious interference with contractual relations on the Plaintiff class under state law. Plaintiffs seek monetary damages as well as injunctive and declaratory relief.

*In re Managed Care Litig.*, 595 F. Supp. 2d at 1351-52. The language in *In re Managed Care Litig.,* cited by the defendants in this case in their reply brief, related to whether certain counts sufficiently "relate[d] to" ERISA plans to trigger preemption. Regarding only that issue, the court wrote:

Section 514(a) provides that ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). The provision serves

as a federal defense to a plaintiff's state law clams when those claims relate to an employee benefit plan governed by ERISA. The key in determining the scope of Section 514 preemption is the meaning of "relate to." A state law having a "connection with or reference to" an ERISA-governed plan is preempted by ERISA Section 514(a). *California Division of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 322, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). If a state law "does not affect the structure, administration, or the type of benefits provided by an ERISA plan, the mere fact that the [law] has some economic impact on the plan does not require that the [law] to be invalidated." *Shaw*, 463 U.S. at 100, 103 S.Ct. 2890. The Eleventh Circuit finds that "[a] party's state law claim 'relates to' an ERISA benefit plan for purposes of ERISA preemption whenever the alleged conduct at issue is intertwined with the refusal to pay benefits." *Garren v. John Hancock Mutual Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997). Thus, "where state law claims of fraud and misrepresentation are based upon the failure of a covered plan to pay benefits," the state law claims have nexus with an ERISA plan and its benefits system. [*Variety Children's Hosp., Inc. v. Century Med. Health Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir. 1995).]

*In re Managed Care Litig.*, 595 F. Supp. at 1355. *In re Managed Care Litig.* is distinguishable because, in the instant case, the conduct at issue in the instant case is not "intertwined with the refusal to pay benefits."[7]

---

[7] The defendants' reply brief also cites *Mason v. Cont'l Grp., Inc.*, 763 F.2d 1219, 1222 (11th Cir. 1985) as "affirming this Court's application of ERISA exhaustion to common law claims including fraud." (Doc. 37 at 6). Actually, the portion of that case cited by the defendants affirms that "[w]hen employees asserting an arbitrable grievance have not attempted to utilize the dispute resolution machinery available to them under the agreement, their independent suit against the employer must be dismissed." *Mason*, 763 F.2d at 1222; *see also, id*. at 1223 ("[The arbitration agreement] clearly supports the district court's decision that plaintiffs were required to submit to arbitration the question of whether the definition of "grievance" included a complaint concerning alleged misrepresentations made by Continental Can with regard to the closing of Plant No. 411. Having agreed to such a broad arbitration clause, plaintiffs are bound to submit arguably extrinsic claims, such as fraud, to the grievance and arbitration process."). Elsewhere, *Mason* <u>does</u> address exhaustion under ERISA, but only in the context of whether the exhaustion

Further, and as the plaintiff argues, "[e]ven if the exhaustion [requirement] applied to these non-ERISA claims, the defense is only available to Aetna, [n]ot Rawlings. . . . Because Rawlings is not a party identified in the plan, and has no role in administering the plan, it cannot avail itself of the exhaustion defense." (Doc. 36 at 12) (emphasis omitted). The defendants do not respond to this argument in their reply brief.

The plaintiff was not required to exhaust his administrative remedies before filing suit. Having made that determination, the court will now address the substantive arguments for dismissal.

## B.   Interference with Business/Contractual Relations (Count One)

In Count One, the plaintiff alleges:

41.   Plaintiff had a business and/or contractual relationship with tortfeasor Kelley, and her insurer Nationwide, and with his uninsured/underinsured carriers Allstate and State Farm. That business relationship resulted in a contract to settle his personal injury cause of action and his claim for uninsured/underinsured insurance benefits in the case of State Farm, and a relationship with Allstate that would have led to a settlement contract with it, but for Rawlings['s] interference.

---

requirement should only be applied to applications for or denials of benefits under the plan, or also to claims involving violations of ERISA's statutory provisions. *Id.* at 1225. As noted by the court: "The question is whether plaintiffs' claims for breach of defendants' fiduciary duties and fraudulent use of the pension plan, claims grounded in statutory provisions of ERISA, should have been brought first through the plan's appeals procedure." *Id.* at 1226. The court held that "plaintiffs must exhaust their remedies under the pension plan agreement before they may bring their ERISA claims in federal court." *Id.* at 1227. As noted above, this holding is now clearly established law. *Mason* is distinguishable from the instant case, as the instant case is not a claim for a violation of ERISA's statutory provisions.

42.     Aetna/Rawlings knew about these relationships, but were strangers to them. Aetna/Rawlings had only a contractual subrogation claim against Daily's recovery in tort.

43.     Aetna/Rawlings interfered with the business relationship and contract between Daily and Nationwide/Allstate/State Farm by threatening to sue if insurers did not satisfy Aetna's complete subrogation interest directly.

44.     This has resulted in damage to [p]laintiff in that he does not have the monies that he contracted for from the tortfeasor or her insurer Nationwide, or [p]laintiff's uninsured/underinsured carrier State Farm, nor could he pursue a similar settlement with Allstate.

45.     Not only has Rawlings/Aetna interfered with Daily's contracts and business relations, it has been done in a fashion that overstates the amounts that may be claimed under any circumstance. Rawlings/Aetna has sought to collect the entire subrogated amount, without accounting for the payment of the expenses and fees necessary to create the fund to which it claims to be subrogated to.

(Doc. 45-1 at 12-13).

In analyzing this claim, it is important to clarify:

Tortious interference with a contractual relationship and tortious interference with a business relationship are "separate and distinct" torts. *White Sands Group, L.L.C.* v. PRS II, LLC, 998 So.2d 1042, 1054 (Ala.2008) ("*White Sands I*") (citation and internal quotation marks omitted). A legal significance of that separation is that "the absence of a valid contract is not fatal to [a] claim of tortious interference with a business relationship." *Id.* . . .

The elements of a cause of action for tortious interference with a business relationship . . . are: "(1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C. v. PRS II, LLC*,

> 32 So.3d 5, 14 (Ala.2009) ("*White Sands II* "). Tortious interference
> with contractual relations, on the other hand, differs as to the first
> element above because "[a] claim of tortious interference with a
> contractual relationship presupposes the existence of an enforceable
> contract." [*White Sands I*, 998 So. 2d at 1054]. Otherwise, the elements
> of both torts overlap. *See generally Gross v. Lowder Realty Better
> Homes & Gardens*, 494 So.2d 590, 597 (Ala.1986) (pronouncing a rule
> "broad enough to encompass both interference with business relations
> and interference with contractual relations"), overruled on other grounds
> in *White Sands II*, 32 So.3d at 14.

*Hope For Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1177 (M.D.

Ala. 2010). The defendants argue that Count One fails because the amended

complaint: 1) fails to allege "wrongful conduct" on the part of the defendants; 2) does

not establish that the defendants are strangers to the contracts/relationships at issue;

and 3) fails to set out "cognizable damages."

### 1. *Rawlings Is Aetna's Agent and the Two Will be Treated as One for the Purpose of Resolving this Motion*

Count One treats Rawlings and Aetna as one entity. (*See* doc. 45-1 at 12-13)

("Aetna/Rawlings knew;" "Aetna/Rawlings interfered;" etc.). However, when arguing

this count in its opposition brief, the plaintiff states that the two entities should be

treated differently. (*See* doc. 36 at 25) ("Rawlings is not a participant in any business

relationship between Daily and the tortfeasor/Nationwide or his insurance carriers;"

"It is important to note that separate interference claims have been brought against

Rawlings and Aetna. While Aetna at least has a singular contractual agreement with

Daily, Rawlings does not even have that.").

The amended complaint alleges that "Rawlings was acting on behalf of Aetna, [the Plan] administrator, and Aetna and Rawlings will be referred to collectively sometimes herein as Aetna/Rawlings." (Doc. 45-1 at 4). Based on these allegations, whatever interference that occurred in this case was done by Rawlings <u>as an agent for Aetna</u>. The Alabama Supreme Court has stated that "the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties . . . and all the purported acts of interference were done within the scope of the interferer's duties as agent." *Waddell & Reed, Inc. v. United Inv'rs Life Ins. Co.*, 875 So. 2d 1143, 1154 (Ala. 2003), *as modified on denial of reh'g* (Sept. 5, 2003) (discussing contracts of insurance and underwriters as agents) (internal citations and quotations omitted).

Based on this language, the court deems it appropriate to treat the two defendants as one for purposes of deciding liability on this count. However Rawlings may have interfered, it did so only through authority given it by its principal, Aetna. Conversely, Aetna is liable for whatever interference Rawlings did as its agent.

## 2. *On the Face of the Complaint, No Wrongful Conduct Is Alleged*

### a. This Issue Arises as Part of the Defendants' Defense of Justified Conduct

The defendants first argue that "[this] tort arises only in the context of wrongful

conduct" and that the alleged threat to sue was not wrongful. (Doc. 24 at 15). However, as part of the plaintiff's *prima facie* case, the plaintiff is not required to prove that the defendant's conduct was "wrongful" or "improper."  The nature of the defendants' "interference" only becomes an issue when determining whether a defendant's interference is "justified"–"an affirmative defense to be pleaded and proved by the defendant." *Gross v. Lowder Realty Better Homes & Gardens*, 494 So. 2d 590, 600 (Ala. 1986) *overruled on other grounds by White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 3d 5 (Ala. 2009).[8] Still, "the existence of an affirmative defense may be clear from the face of the pleadings, in which case a Rule 12(b)(6) dismissal is appropriate." *Singleton v. Dep't of Corr.,* 277 F. App'x 921, 923 (11th Cir. 2008); *see also*, *Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1324 (M.D. Fla. 2011) (citing *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir.1982) ("[a] party may raise an affirmative defense . . . in a Rule 12(b)(6) motion, where the existence of the defense can be judged on the face of the complaint."); *Stephens v. State Farm Fire and Cas. Co.*, No. 1:03–CV–3094–JTC, 2004 WL 5546250, at *1 (N.D. Ga. June 23,

---

[8]  Although *Gross* was overruled by *White Sands II*, the latter decision affirmed the above quoted principles, stating:

> [W]e consider it now to be well settled that the absence of justification is no part of a plaintiff's prima facie case in proving wrongful interference with a business or contractual relationship. Justification is an affirmative defense to be pleaded and proved by the defendant.

*White Sands II*, 32 So. 3d at 12.

2004), *aff'd*, 149 Fed.Appx. 908 (11th Cir.2005).[9]

**b.    The Fact that the Defendants' Conduct Was Justified Appears on the Face of the Pleadings**

In *Gross,* the Alabama Supreme Court explained:

Whether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances. *Restatement (Second) of Torts* § 767 (1979), and Comments. The restatement utilizes the term "improper" to describe actionable conduct by a defendant. Non-justification is synonymous with "improper". If a defendant's interference is unjustified under the circumstances of the case, it is improper. The converse is also true. Section 767 of the *Restatement* lists, and the Comments explain, several items that we consider to be among the important factors to consider in determining whether a defendant's interference is justified:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

---

[9]  The phrase "on the face of the <u>pleadings</u>" is not limited to only the literal pleadings. The motion is still a Rule 12(b)(6) motion, which allows the court to also consider documents central to the plaintiff's claim which are also undisputed–*i.e.* the Plan.  *Horsley*, 304 F.3d at 1134.  Although the court has found no case directly on point, it sees no reason to ignore the general rule simply because the motion is based on a <u>defense</u>.  Accordingly, when the court uses the phrase "on the face of the pleadings," it should be understood to also be referencing the Plan.

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Restatement (Second) of Torts* § 767 (1979).

*Gross*, 494 So. 2d at 597, n.3. *White Sands II* confirmed that, in Alabama, the consideration of these factors is appropriate. *White Sands II*, 32 So. 3d at 12 ("'nature of the actor's conduct,' . . . is one of the factors to be considered in determining whether the interference is justified as stated in *Gross*.").

Not only has Alabama adopted the approach set out by the *Restatement*, it has also adopted the comments attached thereto. The *White Sands II* court approvingly cited not only the above quoted language from *Gross* and the *Restatement*, it also referenced and quoted comment c to section 767. *Id.* at 12-14. Although not <u>all</u> of comment c of the *Restatement* is quoted in *White Sands II* (that court quoted only the portion relevant to that case), it is clear to this court that the Alabama Supreme Court has adopted, and would look to, all of comment c, and the other comments to the *Restatement*, for guidance on this issue. Accordingly, this court will do so also.[10]

In this case, the amended complaint alleges that the alleged interference came in the form of threats to sue. An analysis of the factors set out in the *Restatement* reveals that, under the circumstances of this case, that conduct was justified.

_____

[10] No party contends that the comments are inapplicable.

28

## (1)     The Nature of the Defendants' Conduct

The plaintiff alleged that the defendants interfered with the settlement agreements by "threatening to sue [the insurers] if [the] insurers did not satisfy Aetna's complete subrogation interest directly." (Doc. 45-1 at 12).  Comment c to the *Restatement* discusses "the nature of the actor's conduct," and addresses such threats. It provides:

> *Prosecution of civil suits.* In a very early instance of liability for intentional interference, the means of inducement employed were threats of "mayhem and suits," and both types of threats were deemed tortious. Litigation and the threat of litigation are powerful weapons. When wrongfully instituted, litigation entails harmful consequences to the public interest in judicial administration as well as to the actor's adversaries. The use of these weapons of inducement is ordinarily wrongful if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication. (See §§ 674- 681B). A typical example of this situation is the case in which the actor threatens the other's prospective customers with suit for the infringement of his patent and either does not believe in the merit of his claim or is determined not to risk an unfavorable judgment and to rely for protection upon the force of his threats and harassment.

*Restatement* § 767 cmt. c.

In the instant case, the Plan is clear that Aetna may "pursue any claims that [Daily] may have in order to recover the benefits paid by the [P]lan." (Doc. 24-2 at 66). The Plan also underlines that "[t]he [P]lan may assert a claim or file suit in [Daily's] name and take appropriate action to assert its subrogation claim, with or

without [Daily's] consent." (Doc. 24-2 at 66). Accordingly, it appears that the defendants were only threatening to do what the Plan gave them authority to do. Regardless, even if the defendants did not have the authority to sue under the Plan, there are no facts alleged which show that the defendants <u>knew</u> that any threatened litigation would have no merit.[11] Further, no facts are pled showing that the defendants threatened "to institute the litigation in bad faith," or that they intended "only to harass the third parties and not to bring [the] claim to definitive adjudication." This factor ("the nature of the defendant's conduct") weighs in favor of the defendants.

### (2)    The Defendants' Motive[12]

The comments to the Restatement in part provide that

the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct. Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a

---

[11]  As the defendants note, just because the plaintiff disagrees with the defendants' rights under the Plan, that does not mean that a threat of litigation is "wrongful" or "improper." (*See*, doc. 24 at 16; doc. 37 at 10).

[12]  Although the nature of the defendant's conduct is "a chief factor in determining whether the conduct is improper or not," see, *Restatement* § 767 cmt. c., the court must also consider the other factors set out in the *Restatement*, *i.e.* the actor's motive,  the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference and the relations between the parties." *Id.*  The parties have not argued these other factors.

necessary consequence of his conduct rather than by his desire to bring it about. In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper. A motive to injure another or to vent one's ill will on him serves no socially useful purpose.

*Restatement* § 767 cmt. d. In this case, no facts are pled that show that the defendant intentionally interfered with the alleged settlement agreement, solely for the sake of interfering with the plaintiff's contract, or otherwise injuring him. The defendants' motives were not malicious–they were attempting to enforce contractual rights given to them by the plaintiff. This factor weighs in favor of the defendants.

### (3)    The Interests of the Other with Which the Actor's Conduct Interferes

Comment e provides:

Some contractual interests receive greater protection than others. Thus, depending upon the relative significance of the other factors, the actor's conduct in interfering with the other's prospective contractual relations with a third party may be held to be not improper, although his interference would be improper if it involved persuading the third party to commit a breach of an existing contract with the other. (See, for example, § 768). The result in the latter case is due in part to the greater definiteness of the other's expectancy and his stronger claim to security for it and in part to the lesser social utility of the actor's conduct. Again, the fact that a contract violates public policy, as, for example, a contract in unreasonable restraint of trade, or that its performance will enable the party complaining of the interference to maintain a condition that shocks the public conscience (see § 774), may justify an inducement of breach that, in the absence of this fact, would be improper. Even with reference to contracts not subject to these objections, however, it may be found to

31

be not improper to induce breach when the inducement is justified by the other factors stated in this Section. (See, for example, § 770).

*Restatement* § 767 cmt. e (emphasis added).

There was no contract with AllState. As to any claim of interfering with that relationship, this factor weighs in favor of the defendants.

The plaintiff claims that he had existing contracts with Nationwide and State Farm in the form of settlement agreements. The allegations in the amended complaint could be construed as an attempt, by the defendants, to persuade these other insurance companies to commit a breach of their existing contracts with the plaintiff. However, as noted in the comment, the interference "may be found to be not improper to induce breach when the inducement is justified by the other factors stated in this Section." *Id.* As has already been noted, the Plan allows the defendants to engage in the exact conduct described in the complaint, and the defendants did not interfere just to interfere. Further, as will be shown below, there are other factors which also weigh in favor of the defendants. Accordingly, despite the fact that the amended complaint alleges interference with existing contracts, the court holds that this factor is either neutral or weighs in favor of the defendants.

### (4)    The Interests Sought to Be Advanced by the Actor

Comment f provides in part:

32

Usually the actor's interest will be economic, seeking to acquire business for himself. <u>An interest of this type is important and will normally prevail over a similar interest of the other if the actor does not use wrongful means</u>. (See § 768). If the interest of the other has been already consolidated into the binding legal obligation of a contract, however, that interest will normally outweigh the actor's own interest in taking that established right from him. Of course, the interest in gratifying one's feeling of ill will toward another carries no weight. Some interests of the actor that do carry weight are depicted in §§ 770-773.

*Restatement* § 767 cmt. f. In this case, as has been shown, the means employed by the defendants was not wrongful–it was specifically allowed by the contract to which the plaintiff (the actor alleged to have been wronged) was a party. And, as shown previously, that interest trumps any alleged contract (or business relations) the plaintiff may have thought he had with the other insurance companies. This factor is either neutral or weighs in favor of the defendants.

> ### (5)   The Social Interests in Protecting the Freedom of Action of the Actor and the Contractual Interests of the Other

Comment g provides:

Appraisal of the private interests of the persons involved may lead to a stalemate unless the appraisal is enlightened by a consideration of the social utility of these interests. Moreover, the rules stated in §§ 766-766B deal with situations affecting both the existence and the plan of competitive enterprise. The social interest in this enterprise may frequently require the sacrifice of the claims of the individuals to freedom from interference with their pursuit of gain. Thus it is thought that the social interest in competition would be unduly prejudiced if one were to be prohibited from in any manner persuading a competitor's

33

prospective customers not to deal with him. On the other hand, both social and private interests concur in the determination that persuasion only by suitable means is permissible, that predatory means like violence and fraud are neither necessary nor desirable incidents of competition. (See further § 768).

*Restatement* § 767 cmt. g.

Although the court is sensitive to the importance of protecting settlement agreements, there is a strong policy argument for allowing the conduct which occurred in this case. Allowing a subrogee to directly communicate with third party insurers to negotiate its claim, <u>when that right specifically exists in the contract the plaintiff signs</u>, protects and enforces a right <u>to which all parties to the insurance contract agreed</u>. In Alabama, "[i]f the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written." *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000). Absent any argument from the parties that there is any ambiguous provision in the agreement, it is not this court's place to rewrite the contract.

Also, there are many reasons why an insurance company would require such an agreement from its insured. Providing a mechanism for the collection, by the subrogee, of its interest directly against third parties can help eliminate the situation where an insurer has to seek reimbursement from its insured–a situation which could

lead to a strain on that relationship. Further, forcing a subrogee to wait until his insured receives payment could lead to the situation where those funds are spent, or otherwise encumbered by the subrogor, before the subrogee can be reimbursed. Enforcing the contract as written gives all future contracting parties a measure of certainty, so that the allocation of risk, reward, duties, and costs can be evaluated more precisely. This ultimately leads to a savings to all parties.

Also, the benefit to allowing subrogees to participate in negotiations, by communicating directly with insurers, can result in more streamlined, faster, and possibly even larger, settlements. Third party insurers understand the liability associated with not considering such interests, and are careful to consider them. Indeed, as pled in the instant amended complaint, they were considered. (Doc. 45-1 at 5). This factor weighs in favor of the defendants.

### (6)    The Relations Between the Parties

"The relation between the parties is often an important factor in determining whether an interference is proper or improper." *Restatement* § 767 cmt. i. As noted previously, this is not the case of a competitor of the plaintiff interfering with his right to receive <u>any</u> settlement proceeds from the third party insurers. Instead, as noted, the defendants were attempting to enforce a subrogation interest given to them <u>by the plaintiff</u> via the plaintiff's contract with the defendants. Indeed, the Plan

provides that Aetna "stand[s] in the place of" the plaintiff with regards to "all rights of recovery with respect to any claim or potential claim against any party." (Doc. 24-2 at 66).  Under the Plan, Daily and the defendants are the <u>same party</u> for purposes of the subrogation interest. This factor weighs in favor of the defendants.

### (7)   The Proximity or Remoteness of the Actor's Conduct to the Interference

Comment h provides:

> One who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. The interference is an immediate consequence of the conduct, and the other factors need not play as important a role in the determination that the actor's interference was improper. The actor's conduct need not be predatory or independently tortious, for example, and mere knowledge that this consequence is substantially certain to result may be sufficient.

*Restatement* § 767, cmt. h.  The defendants' contact with the third party insurers, entities which were parties to the settlement agreement with the plaintiff, directly led to those defendants not performing on those contracts.  This factor is the only factor that  weighs in favor of the plaintiff.

On the whole, this court holds that the *Restatement* factors weigh in favor of the defendants.

### c.   The Plaintiff's Arguments in Opposition to the Defense Are of No Merit

In his response to the motion, the plaintiff acknowledges that the Plan provides

that Aetna may "pursue any claims that [Daily] may have in order to recover the benefits paid by the [P]lan," but then states that this language "purports to assign 'reimbursement' claims . . . as to the Plan. However, Daily has no 'reimbursement' claim.[] The contractual right to be reimbursed is the [P]lan's claim against Daily." (Doc. 36 at 21, n. 10). This confusing argument is factually incorrect. The quoted language comes directly from the section of the Plan entitled "Subrogation." It clearly references only subrogation. "Reimbursement" has its own subsection. The defendants have a right, under the Plan, to assert their subrogation interest in this manner.

The plaintiff also cites *Blue Cross and Blue Shield of Alabama v. Freeman*, 447 So. 2d 757, 760 (Ala. Civ. App. 1987) ("*Freeman*") for the proposition that the defendants cannot make a direct subrogation claim against third parties, and that the underlying tort claim is not assignable. *Freeman* stands for neither proposition. In *Freeman*, the plaintiff's health insurer, Blue Cross, intervened in the plaintiff's personal injury action and "demanded judgment only against the recovery by plaintiffs up to the amount of the benefits it had paid to plaintiff." *Freeman*, 447 So. 2d at 758. The trial court granted conditional summary judgment "solely in favor of Blue Cross for the amount of $1,585.40 and against any funds recovered by plaintiffs from defendant[, the tortfeasor]." *Id.* Thereafter,

37

> Blue Cross did not appear on the date set for trial. Its counsel previously informed other counsel and the court that in view of its previous judgment it would not appear at trial unless requested to do so.
>
> On [the] trial date, April 14, 1983, the matter was settled, after negotiations between original plaintiffs and defendant, for $13,000. Judgment in that amount was entered on April 29, 1983, in favor of plaintiffs. On April 27, plaintiffs filed a motion to assess against the judgment of Blue Cross a pro rata share of attorney fees and expenses incurred in the prosecution and recovery of the judgment against defendant.
>
> The motion was heard by the court upon affidavit and argument, and judgment in the amount of $573.16 rendered in favor of plaintiffs' attorney on June 27, 1983. From that order Blue Cross [] appealed.

*Id.*

The sole issue in *Freeman* was whether the subrogee, Blue Cross, in having its counsel intervene to obtain a conditional judgment on its behalf, fell within an exception to the "common fund doctrine," because such intervention "assist[ed] in the prosecution or contribute[d] toward the expense of the recovery of the fund." *Id.* at 759. The court held that it did not. *Id.* Nothing in *Freeman* forbids a subrogee to proceed directly against the funds-holder if it chooses to do so. Further, the case does not stand for, or discuss, the proposition that "the underlying tort claim is not assignable." (Doc. 36 at 21).

The plaintiff next argues that, under Alabama law, any "assignment" of the plaintiff's personal injury claim to Aetna would be "ineffectual." (Doc. 36 at 22-23).

The Supreme Court of Alabama has noted that, as to the right to recover for a purely personal tort, the "general rule" is that "one cannot assign a personal injury action to another or appoint an agent or attorney-in-fact to bring a personal injury lawsuit on his behalf." *Miller v. Jackson Hosp. & Clinic*, 776 So. 2d 122, 125 (Ala. 2000) (citing *Lowe v. Fulford*, 442 So.2d 29, 32 (Ala.1983) (" 'It is ... well settled that, in the absence of statutory provision, rights of action for torts purely personal do not survive, and are not assignable.' ") (*in turn quoting Holt v. Stollenwerck*, 174 Ala. 213, 215, 56 So. 912 (1911))). However, as noted <u>by the plaintiff</u> in two cases he cites, subrogation is different from assignment.

First, the plaintiff quotes the following language from *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Anderson*, 48 Ala. App. 172, 177, 263 So. 2d 149, 154 (Civ. App. 1972) (*Anderson*):[13]

> [A] subrogation clause limited only to a portion of the proceeds of a personal injury claim sufficient to reimburse the insurance carrier for the indemnity paid its insured under a medical coverage provision, <u>does not constitute an assignment of the cause of action of the insured against the tort-feasor</u>.

(Doc. 36 at 22) (emphasis added) (quoting *Anderson*, 263 So. 2d at 154).[14] Next, he

---

[13] In his brief, the plaintiff incorrectly cites the title of this case as "*Alabama Farm Bureau v. Floyd.*" (Doc. 36 at 22). The defendant's name in that case is Floyd Anderson.

[14] The plaintiff notes that the subrogation language in *Anderson* was indistinguishable from that in the instant case. (Doc. 36 at 22, n. 11).

cites *Ex parte State Farm Mut. Auto. Ins. Co.*, 118 So. 3d 699, 704 (Ala. 2012), for the exact same proposition. (Doc. 36 at 22); *see also, Alabama Farm Bureau Mut. Cas. Ins. Co. v. Williams*, 365 So. 2d 315, 317 (Ala. Civ. App. 1978) (*Williams*) ("[P]olicy provisions for subrogation of the insurer to the right of the insured to recover medical benefits from a tortfeasor after payment under the policy [are] valid and enforceable in this state."). Daily cites <u>no</u> authority for the proposition that a subrogation clause constitutes an impermissible assignment under Alabama law.

Finally, the plaintiff argues that the subrogation clause operates to "split" the plaintiff's "cause of action for medical payment reimbursement . . . from the tort claim," in violation of Alabama law. (Doc. 36 at 23). However, the Alabama Court of Civil Appeals has held that subrogation clauses do no such thing. *Anderson*, 263 So. 2d at 154 ("Nor do we consider that the subrogation clause provides for a splitting of the cause of action, since, there being no assignment as to the cause of action, only one action may be maintained against the tort-feasor.").[15]

Because, as pled, it is clear that the defendants were justified in their actions, there is no claim for interference. Count One will be dismissed.

### 3.   *The Defendants Were Not Strangers to the Plaintiff's Contract/Business Relations*

---

[15] Again, the plaintiff makes this argument <u>and</u> then cites *Anderson*, and the language quoted by this court above, which directly refutes his argument.

Count One is also due to be dismissed for the additional and alternative reason that the defendants are not strangers to the contracts or business relationships at issue. "[A] party to a contract cannot be charged with interfering with that contract." *Ex parte Blue Cross & Blue Shield of Alabama*, 773 So. 2d 475, 480 (Ala. 2000) (*citing Bama Budweiser of Montgomery, Inc. v. Anheuser–Busch, Inc.*, 611 So.2d 238 (Ala.1992), and *Lolley v. Howell*, 504 So.2d 253 (Ala.1987)). While the plaintiff argues that "neither Aetna [nor] Rawlings have contracts with the third party insurers" (doc. 36 at 24), Alabama law is clear that "[o]ne is not a stranger to the contract just because one is not a party to the contract." *Waddell,* 875 So. 2d at 1154. "[W]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized." *Waddell*, 875 So. 2d at 1153 (internal citations and quotations omitted).[16]

---

[16] The defendants cite *Ex parte Blue Cross & Blue Shield of Alabama*, and contend that the conduct in the instant case is the same type of tripartite relationship as was present there. In that case, Blue Cross wrote a letter to two of its own insureds who were also patients of the same dentist. Each letter "explain[ed] to the particular patient that Blue Cross was denying payment for certain procedures performed on the patient on the ground that the procedures were outside the scope of [their dentist's] license as a dentist." *Ex parte Blue Cross & Blue Shield of Alabama*, 773 So. 2d at 477. The dentist sued Blue Cross, in part, for interfering with his contractual relations with his patients. The court wrote:

> [W]hile Dr. Guthrie charged Blue Cross with interfering with his contractual relations with his patients . . . , Blue Cross was, itself, a party to these same

The plaintiff argues that "neither Aetna [nor] Rawlings have contracts with the third party insurers." (Doc. 36 at 24). However, Daily ignores the fact that, in this case, the Plan provides that Aetna (and, by extension, its agent–Rawlings) "stand[s] in the place of" the plaintiff with regards to "all rights of recovery with respect to any claim or potential claim against any party." (Doc. 24-2 at 66). These entities <u>are the plaintiff</u>, for purposes of any settlement, and therefore are parties to the settlement contracts he negotiated, and business relationships in which he participated.[17]

---

contractual relations. The record establishes both explicitly and implicitly that Dr. Guthrie and his patients contracted together in reliance on the contractual obligation of Blue Cross to pay for dental services covered by the policy between Blue Cross and the patients. Interdependent contractual relations existed among Dr. Guthrie, his patients, and Blue Cross. This contractual situation invokes the rule that a party to a contract cannot be charged with interfering with that contract. *Bama Budweiser of Montgomery, Inc. v. Anheuser–Busch, Inc.*, 611 So.2d 238 (Ala.1992), and *Lolley v. Howell*, 504 So.2d 253 (Ala.1987). While the rights and duties between different sets of parties to a multiparty contract may differ and the respective interests of the parties may compete, the performance of one of the duties or the pursuit of one of the competing interests cannot be validly branded as interference.

*Id.* at 480. The instant case does not present the same type of "interdependent" contracts that were at issue in *Ex Parte Blue Cross*. In *Ex Parte Blue Cross* "Dr. Guthrie and his patients contracted together in reliance on the contractual obligation of Blue Cross to pay for dental services." *Id.* It was the contract for dental services which allegedly had been interfered with, and which had been dependant on Blue Cross's agreement with the patient. In the instant case, Daily has a contract with the Aetna, and, by extension, Rawlings. But Daily's settlement discussions with the third party insurers (the relationships that are alleged to have been interfered with) were not "dependent" on any obligation on the part of Aetna or Rawlings.

[17]   Even if they did not stand in the place of the plaintiff, "[a] person with a direct economic interest in the contract is not a stranger to the contract." *Waddell*, 875 So. 2d at 1157. The defendants' subrogation interest provides them with a very real and direct economic interest in the settlement negotiations, and, of course, in the settlements themselves. The same rationale applies to any alleged interference with business relations. *See, Tom's Foods, Inc. v. Carn*, 896

The plaintiff also argues that the only legitimate interest the defendants have is a lien on whatever the plaintiff recovers, less the costs of that recovery. (Doc. 36 at 26-28). Under the Plan, that is simply not the case. The Plan allows the defendants to "assert a claim or file suit in [Daily's] name and take appropriate action to assert its subrogation claims, <u>with or without [Daily's] consent.</u>" (Doc. 24-2 at 66). Again, the defendants <u>are</u> Daily for the purposes of their subrogation interest in any settlement. Further, based on this language, the defendants need not wait for Daily to recover anything before protecting their interest.[18]

Importantly, the plaintiff cites no case (and this court has not found such a case) from any jurisdiction, where a subrogee has been held liable for intentional interference under similar circumstances. The defendants are not strangers to the

---

So. 2d 443, 454 (Ala. 2004) ("[a] defendant is a party in interest to a [business or contractual] relationship if the defendant has any beneficial or economic interest in, or control over, that relationship.") (internal citations and quotes omitted).

Also, it strains credulity to argue, as the plaintiff does, that "Aetna/Rawlings are not essential to the settlement of Daily's tort claim. They have no role in that dispute or its settlement." (Doc. 36 at 25). It is common knowledge that subrogation interests are always a factor which are taken into account in negotiating settlements. Indeed, the amended complaint states that the claim with Nationwide was not settled until <u>after</u> that entity received confirmation of the amount of Aetna's interest. (Doc. 45-1 at 5). It also notes that "[o]n December 1, 2014, counsel for Mr. Daily received a letter from Allstate <u>agreeing to waive its subrogation interest,</u> and advising him to accept the Nationwide offer." (Doc. 45-1 at 5) (emphasis added).

[18] The plaintiff cites *Ex Parte State Farm Mutual*, 118 So. 3d 699 (Ala. 2012), for the proposition that "tort settlement proceeds constitute a common fund." (Doc. 36 at 27). From this, he argues that the defendants must pay a pro-rata share of the attorney's fees earned in the creation of the settlement. Whatever the merits of this argument, it has no application to whether or not the defendants had <u>some</u> economic interest in the settlement.

settlement.[19]

## C.   The Fair Debt Collection Practices Act Claim (Count Two)

Count Two alleges:

47.   Rawlings is a "debt collector" under 15 U.S.C. §1692 a(6).

48.   The obligation that Rawlings has attempted to collect Aetna's subrogation interest is a debt pursuant to 15 U.S.C. §1692 a(5).

49.   Rawlings attempted to collect Aetna's subrogation interest after a settlement had been reached, but before the proceeds from Nationwide, Allstate, and State Farm has been paid to Daily, through his attorney. As such, those collection efforts were an attempt, by debt collector, to collect a debt, subject to all of the protections of the FDCPA. Rawlings' actions in attempting to collect this debt violate the FDCPA in the following specifics:

    a.   Rawlings' communications with Nationwide, Allstate, and State Farm violated 15 U.S.C. §1692c in that they are communications with a third party about the debt without the consent of the debtor.

    b.   To the extent Rawlings communicated after a settlement had been consummated, but before monies could be paid, Rawlings failed to notify Mr. Daily in its initial communication through counsel, that its contacts were an attempt to collect a debt.

50.   Rawlings' communications with Nationwide, Allstate, and State Farm are not merely technical violations of the FDCPA, but have real practical, detrimental consequences on tort victims like Mr. Daily. By asserting, wrongly, that Aetna has any right to recover any money

---

[19]  In light of this court's holdings as to the defendants' defense, and whether the defendants were "strangers" to the contract, it will not address the defendants' argument (nor the plaintiff's response at doc. 36 pp. 28-32) that the plaintiff has not alleged "cognizable damages."

directly from tortfeasors and their insurance companies, Rawlings wrongfully alleges that the insurance companies or tortfeasors will be subject to liability if they pay monies directly to Aetna insureds. And it knows better, or should know better. The fact of the matter is that Rawlings has no cause of action against tortfeasors or their insurance companies directly, and its insistence changes the leverage of a negotiation between the tort victim and subrogation claimant, taking leverage away from the tortfeasor who, without this misrepresentation of the law, would be free to tell Rawlings that if it does not reduce its lien to an acceptable amount, the tort victim will not pursue an otherwise valid action, leaving Rawlings with no tort recovery to subrogate to. Instead, tortfeasors' insurance companies will not settle cases unless Rawlings' demands are met, meaning tort victims like Daily have no contested claim that is the fulcrum to a negotiation with Aetna/Rawlings to reduce its demand.

(Doc. 45-1 at 13-15).

The section cited by the plaintiff (15 U.S.C. § 1692c) sets out certain requirements that a "debt collector" must follow prior to collecting a "debt." 15 U.S.C. § 1692c. Rawlings argues that the subrogation interest it sought to collect is not a "debt" within the meaning of the statute, and that, even if it is, Rawlings is not a "debt collector."

### 1. *The Subrogation Interest in This Case Is a "Debt."*

The defendants urge the court to apply the Eleventh Circuit's holding in *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998), which addressed subrogation in a slightly different context than the instant case. In *Hawthorne*,

> Hawthorne was involved in an accident, allegedly resulting from her negligence. Liberty Mutual Insurance Company ("Liberty Mutual") insured the other party to the accident, who was damaged in the amount of $2,020.18. After paying its insured's claim, Liberty Mutual then provided Mac Adjustment with subrogation rights to the $2,020.18 it claimed Hawthorne owed. On June 5, 1996, Mac Adjustment sent Hawthorne a letter requesting payment of the subrogation claim incurred by Liberty Mutual.

*Hawthorne*, 140 F.3d at 1369. The letter sent by Mac Adjustment was the basis for

Hawthorne's FDCPA claim. In finding that there was no FDCPA claim, the Eleventh

Circuit stated

> The FDCPA defines "debt," . . . as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to a judgment." 15 U.S.C. § 1692a(5).

> . . .

> By the plain terms of the statute, not all obligations to pay are considered "debts" subject to the FDCPA. *See Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir.1997). Rather, the FDCPA may be triggered only when an obligation to pay arises out of a specified "transaction." Although the statute does not define the term "transaction," we do not find it ambiguous. A fundamental canon of statutory construction directs us to interpret words according to their ordinary meaning. *See Anderson v. Singletary*, 111 F.3d 801, 804 (11th Cir.1997) (*citing Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979)). The ordinary meaning of "transaction" necessarily implies some type of business dealing between parties. *See Webster's New Collegiate Dictionary* 1230 (1979) (defining "transaction" as "a business deal"); *Bass*, 111 F.3d at 1325 (citing *Webster's New World Dictionary* 1509 (2d ed. 1986)). In

46

other words, when we speak of "transactions," we refer to consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence. *See Bass*, 111 F.3d at 1326 ("[T]he FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services."). While we do not hold that every consensual or business dealing constitutes a "transaction" triggering application of the FDCPA (such a holding would be contrary to the plain language of the statute limiting applicability to specified transactions, as well as to other portions of the statute not relevant to this analysis, which require the existence of other conditions before the FDCPA applies), at a minimum, a "transaction" under the FDCPA must involve some kind of business dealing or other consensual obligation.

*Hawthorne*, 140 F.3d at 1371. The court went on to hold that the subrogation interest, was an "obligation to pay . . . damages arising out of an accident [which] does not arise out of any consensual or business dealing." *Id*. Therefore it "plainly . . . does not constitute a 'transaction' under the FDCPA." *Id.; see also, Schaefer v. Seattle Serv. Bureau, Inc.*, No. 2:15-CV-444-FTM-38CM, 2015 WL 9031511, at *4 (M.D. Fla. Dec. 16, 2015) (Chappell, J.) (applying *Hawthorne* and finding no transaction and no consumer debt in subrogation interest).

The plaintiff argues that this court should instead follow the Fifth Circuit's decision in *Hamilton v. United Healthcare of Louisiana, Inc.*, 310 F.3d 385, 387 (5th Cir. 2002) (*Hamilton I*), which dealt with facts more similar to the instant case. The court explained the facts of that case as follows:

> In October of 1999, Hamilton was seriously injured in a single-vehicle automobile accident in which he was a passenger. As a

47

result of the accident, Hamilton required medical and other treatment. Defendant, United Healthcare of Louisiana, Inc. ("United"), had in force a group health plan, offered through Hamilton's father's employer, pursuant to which Hamilton was insured as a dependent. Pursuant to that coverage, United paid for certain of the medical and other services necessitated by the accident, allegedly totaling in excess of $100,000. At the time of the accident, Hamilton's father also had in effect uninsured and/or underinsured motorist ("UM") coverage pursuant to two polices with State Farm Insurance Company ("State Farm"). State Farm paid nearly $250,000 in UM benefits and $5,000 in MedPay benefits to Hamilton pursuant to those policies. Shortly thereafter, HRI, acting pursuant to its contract with United, began sending notices to Hamilton's father and State Farm in an attempt to enforce subrogation rights that United claimed to have against any of the proceeds that Hamilton might receive from third parties, including his own insurer State Farm. State Farm, through Hamilton's counsel, subsequently paid $57,757.06 out of the $250,000 UM policy proceeds, to which Hamilton would have otherwise been entitled, to HRI on behalf of United. Hamilton then retained new counsel who attempted to recover the monies that United had obtained from State Farm. . . . Hamilton alleged that HRI's acts during its recovery of funds from himself and others violates the FDCPA . . ..

*Hamilton*, 310 F.3d at 387-88. The Fifth Circuit, acknowledging and addressing the

Eleventh Circuit's opinion in *Hawthorne*, wrote:

We cannot avoid the inescapable conclusion that the plain meaning of "debt" encompasses the funds owed in this case. There is no question that the obligation to pay arose out of Hamilton's transaction of purchasing insurance. HRI is simply incorrect in its assertion that the obligation to pay arose out of a tortious act. *Hawthorne* itself suggests that Hamilton's obligations arose out of a consumer transaction for purposes of the FDCPA. As opposed to *Hawthorne*, where Hawthorne's obligations arose from tort law, Hamilton's obligations arose from a business transaction where Hamilton contracted for personal and family services, i.e., insurance. Moreover, the plain meaning of "arising out of" as "stemming from" leads us to conclude that the obligation to pay arose

from the contract/transaction for insurance.

*Id.* at 392.

*Hawthorne*, which is binding precedent in this circuit, does not stand for the proposition that <u>no</u> subrogation interest can be a "debt." It merely explains that a subrogation interest is not a "debt" unless it is "a specified 'transaction,'" which involves "some type of business dealing between parties," and "not damage obligations thrust upon one as a result of no more than her own negligence." *Hawthorne*, 140 F.3d at 1371. The court holds that the funds owed in this case, like those in *Hamilton I*, <u>are</u> owed as a result of "a specified 'transaction,'" which involves "some type of business dealing between parties," and "not damage obligations thrust upon one as a result of no more than her own negligence." *Id.* at 1371. In *Hawthorne*, the plaintiff owed funds because he caused the underlying accident. In this case, the plaintiff owes funds as a result of a contract to which the plaintiff was a party. Thus, *Hawthorne* is distinguishable. The court holds that the interest in this case is a "debt" under the FDCPA.

## 2.    *Rawlings Is Not a Debt Collector*

Regardless, the plaintiff still cannot recover under this claim because Rawlings is not a "debt collector" under the FDCPA. The term "debt collector" means "any person who uses any instrumentality of interstate commerce or the mails in any

business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. §1692a(6). However, the term does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." 15 U.S.C. 1692a(6)(F)(iii).

In *Hamilton v. Trover Solutions, Inc.* 2003 WL 21105100 (E.D. La. May 13, 2003) (*Hamilton II*), the Eastern District of Louisiana addressed, for a second time, the issues which had arisen in *Hamilton I*, cited above. In this second opinion, the court explained that a subrogation interest, such as that in the instant case, is "not in default" because it is not possible for the plaintiff to be in default until he began receiving payments from third parties. *Hamilton v. Trover Sols., Inc.*, No. CIV.A. 01-650, 2003 WL 21105100, at *3 (E.D. La. May 13, 2003) aff'd, 104 F. App'x 942 (5th Cir. 2004)[20]; *see also, Hamilton v. Avectus Health Care Sols.*, LLC, No. 5:13-CV-01967-SGC, 2015 WL 5693610, at *9 (N.D. Ala. Sept. 29, 2015)

---

[20] The plaintiff refers to the Fifth Circuit's affirmance of this case as "*Hamilton II*." This court has not cited the Fifth Circuit opinion as it adds nothing to this discussion. *See Hamilton v. Trover Sols., Inc.*, 104 F. App'x 942, 944 (5th Cir. 2004) ("For the reasons given by the district court, we agree that Trover Solutions is not a 'debt collector' under the FDCPA. The undisputed evidence shows that Trover Solutions obtained the responsibility to recover Hamilton's debt prior to that debt being in default.").

(Cornelius, M.J.) (citing *Hamilton II*, and holding that debt to hospital, on which hospital had a lien against recovery from third parties, could not have been in default under FDCPA until plaintiff received payments from the insurers); *Kesselman v. The Rawlings Co., LLC*, 668 F. Supp. 2d 604, 612 (S.D.N.Y. 2009) (Jones, J.)(citing *Hamilton II*, and holding that "[p]laintiffs do not allege the existence of any debt that was in default [under the FDCPA] at the time it was obtained by the Subrogation Agent [d]efendants. The earliest date the [p]laintiffs' debts could have been in default was the date they first received payment from any third parties in connection with their motor vehicle accidents.").[21]

The court is persuaded by the opinions cited above. It is alleged that the plaintiff in the instant case has recovered no payments from third parties, and so his "debt" is not in default. The exception in Section 1692a(6)(F)(iii) applies and, in this case, Rawlings is not a debt collector. For that reason, there is no FDCPA claim and Count Two is due to be dismissed.[22]

### D.   The Unauthorized Practice of Law Claim (Count Three)

In order to state a claim for the unauthorized practice of law, the plaintiff must

---

[21]  There is no merit to the plaintiff's argument that, because the defendants claim an obligation to be paid directly from third parties, the debt is already in default. (*See* doc. 36 at 20).

[22]  There is no merit to the plaintiff's judicial estoppel argument.  (Doc. 36 at 16).  The defendants' argument regarding Counts One and Two are not inconsistent.

allege that: 1) Rawlings was not licensed to practice law in Alabama; 2) Rawlings made representations concerning the law; and 3) the plaintiff was injured as a result of those representations. *Fogarty v. Parker, Poe, Adams & Bernstein, L.L.P.*, 961 So. 2d 784, 790 (Ala. 2006), as modified on denial of reh'g (Jan. 12, 2007). Rawlings argues only that the plaintiff has failed to prove damages <u>as a result of any alleged representations concerning the law</u>. (Doc. 24 at 24-26). It is correct. The only damages alleged in the amended complaint are the plaintiff's failure to receive the settlement funds for which he states he contracted. However, these damages come only from the alleged <u>interference</u> with those contracts by the defendants, not from alleged legal representations made to the plaintiff.[23]

Further, there is no merit in the plaintiff's argument that Rule 8 only requires him to plead damages generally. (Doc. 36 at 15). The plaintiff cites *Cochran v. Five Points Temporaries, LLC,* 907 F. Supp. 2d 1260, 1280 (N.D. Ala. 2012), for the proposition that "a general statement of . . . damages is sufficient to prevail in a motion to dismiss." (Doc. 36 at 15) (quoting *Cochran v. Five Points Temporaries,*

---

[23] The amended complaint states:

32.      As a result of Rawlings/Aetna's <u>interference</u>, Daily does not have the $125,000.00 in settlement funds that he has contracted for, or what funds he would have had as the result of his insurance policy with Allstate.

(Doc. 45-1 at 8) (emphasis added).

*LLC*, 907 F. Supp. 2d 1260, 1280 (N.D. Ala. 2012). However, when read in context, the court was discussing pleading the Alabama state claim for "breach of contract," from which "general damages do not have to be specifically plead because they are considered to flow naturally and necessarily from the alleged wrongful act." *Cochran*, 907 F. Supp. 2d 1280.

In that very same case, in dealing with a separate claim, <u>the court dismissed the plaintiff's claim for unlawful interference, for failing to adequately state damages</u>. It stated:

> [A] cause of action in Alabama for unlawful interference with business relations includes the element of damages. . . . The Alabama Supreme Court has held that damages for unlawful interference may include emotional distress, as long as it is "reasonably to be expected to result from the interference." . . . Although plaintiff states that she suffered emotional distress as a result of defendants' Motion to Disqualify, Count VIII is due to be dismissed because it fails to state a plausible claim. *See Speaker v. United States Dept. of Health and Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1381 (11th Cir.2010) ("[G]iven the pleading standards announced in *Twombly* and *Iqbal*, [plaintiff] must do more than recite these statutory elements in conclusory fashion. Rather, [her] allegations must proffer enough factual content to 'raise a right to relief above the speculative level.' " (*quoting Twombly*, 550 U.S. at 555, 127 S.Ct. 1955)). Count VIII of the Amended Complaint states that defendants' alleged intentional interference "further proximately caus[ed] injuries to [p]laintiff—even more emotional distress." (Doc. 36 ¶ 164.) This statement implies that the claim for intentional interference is not the only complained of conduct by defendants causing plaintiff to endure emotional distress. Indeed, the only other mention of such damages is under plaintiff's claim for "additional unlawful retaliation" under Title VII and § 1981, which is also based on defendants' Motion to Disqualify: "The above-described

additional retaliatory conduct on the part of [d]efendants has injured [p]laintiff, causing her even more emotional distress." (Doc. 36 ¶ 159.) <u>Aside from these two conclusory statements, the Amended Complaint does not allege facts reflecting that plaintiff suffered emotionally due to defendants' Motion to Disqualify or for any other reason</u>. The Amended Complaint does not make any other reference to the Motion to Disqualify except in Counts VII and VIII. Moreover, the business relationship between plaintiff and the Frederick Firm was never severed, a fact which further erodes the plausibility of plaintiff's claim. <u>Plaintiff's assertion of "even more emotional distress" does not constitute damages reasonably expected to result from the alleged intentional interference. Thus, Count VIII will be dismissed.</u>

*Cochran v. Five Points Temporaries, LLC*, 907 F. Supp. 2d 1260, 1275 (N.D. Ala. 2012).

Like in *Cochran*, in the instant case "damages" flowing from the defendants' alleged legal representation are an element of the claim for the unauthorized practice of law. The only damages alleged in this case, the failure of settlement funds to be paid, flow from the interference claim, not from the fact that Rawlings representatives, who allegedly were not lawyers, engaged in the unauthorized practice of law.[24] Count Three is due to be dismissed.

---

[24] The plaintiff also cites *Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012), for the proposition that "[a]n allegation that plaintiff suffered 'financial injury' [is] sufficient." (Doc. 36 at 15). Importantly, in that case, the court noted that "[p]laintiffs allege that they have become victims of identity theft and have suffered monetary damages as a result. This constitutes an injury in fact under the law." *Resnick*, 693 F.3d at 1323. First, the court, in that passage, was addressing whether the plaintiff therein had "standing"–not whether it sufficiently stated a claim. Indeed, the court specifically noted: "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice <u>to establish standing</u>. *Id.*(emphasis added). Second, *Resnick* is distinguishable on its facts as, in the instant case, there are no allegations of financial injury <u>flowing from the tort of unauthorized practice</u>. The amended complaint in this

## IV.   CONCLUSION

For the above stated reasons, Counts One, Two, and Three are due to be, and

will be, **DISMISSED with prejudice**. Count Four, which alleges only relief, will also

be dismissed as having no substantive basis in the absence of the other three counts.

A final order will be entered. The motion to amend will be **DENIED** as futile. The

motion to stay will be **DENIED** as moot.

**DONE** and **ORDERED** this 15th day of January, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

case merely alleges that "[the] [p]laintiff and the class have been damaged."  (Doc. 45-1 at 18).
Such damages seem particularly unlikely in this case, as it is clear from the amended complaint
and the plaintiff's brief that, at all relevant times, the plaintiff was represented by his own
counsel.